**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DOROTHY JEAN BOLDEN,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-00695-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case**[1] |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Based on the relevant filings, evidence and applicable law, the final decision of the

Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the

Social Security Act should be **AFFIRMED**.

## I.    BACKGROUND

Dorothy Jean Bolden (Plaintiff) filed her application for DIB on November 8, 2018, and

her application for SSI on August 5, 2019, alleging disability beginning on August 30, 2018. (doc.

18-1 at 56, 156.)[2] Her claim was denied initially on January 29, 2019, and upon reconsideration

on April 10, 2019. (*Id.* at 83, 88.) After requesting a hearing before an Administrative Law Judge

(ALJ), she appeared and testified at a hearing on March 23, 2020, which was held by telephone.

(*Id.* at 19, 34-54, 92-94.) On May 11, 2020, the ALJ issued a decision finding her not disabled.

(*Id.* at 19-28.) Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 4, 2020.

(*Id.* at 153-55.) The Appeals Council denied her request for review on January 26, 2021, making

---

[1] By consent of the parties and order filed July 29, 2021 (docs. 21-22), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-7.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

## A.  Age, Education, and Work Experience

Plaintiff was born on February 13, 1968.  (doc. 18-1 at 156, 220.) She had a high school education, could communicate in English, and had past relevant work as a cashier. (*Id.* at 193, 195-96.)

## B.  Medical Evidence[3]

On February 15, 2017, Plaintiff presented to the emergency room (ER) at Parkland Health & Hospital System (Parkland), complaining of "shooting" pain in her left elbow that radiated to her left upper extremity and made it difficult to sleep. (*Id.* at 292.) She kept a blood sugar log, and her recorded blood sugar levels had been "around the 200s"; she felt tingling in her left fingers, and she had been compliant with taking diabetes mellitus medication. (*Id.*) She denied any respiratory, cardiovascular, or gastrointestinal symptoms, but had arthralgias (but no joint swelling) and numbness in her left fingers (but no weakness or headaches). (*Id.* at 293.) She had normal cardiovascular, neurological functioning and range of motion with no edema, but she was tender from left elbow to left lateral epicondyle with reproducible symptoms and had Tinel's sign[4] over her left wrist with 4/5 grip strength on the left. (*Id.* at 294.) Her diabetes mellitus was "poorly controlled", and she was diagnosed with radiculopathy, unspecified spinal region, type 2 diabetes mellitus without complication, unspecified long-term insulin use status, and lateral epicondylitis

---

[3] Because Plaintiff's only issue focuses on the medical opinion relating to her physical limitations, only the relevant physical medical evidence is recited. (*See* doc. 27 at 4.)

[4] "Tinel's sign is defined as 'a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve.'" *Ronda C. v. Berryhill*, No. 3:17-CV-2114-G-BH, 2018 WL 4658504, at *1 n.4 (N.D. Tex. Sept. 7, 2018), *report and recommendation adopted*, No. 3:17-CV-2114-G (BH), 2018 WL 4637292 (N.D. Tex. Sept. 26, 2018).

of elbow. (*Id.* at 290, 294.) She was discharged the same day, prescribed gabapentin, instructed to continue her usual medication, and advised to follow up with her internist. (*Id.* at 294.)

The next day, on February 16, 2017, Plaintiff visited internist Vijaya Nama, M.D. (Internist), with complaints of tendinitis, decreased range of motion in the shoulder, and pain in her left shoulder, left neck, and left hand radiating from the elbow. (*Id.* at 385, 387.) She had been compliant in taking Robaxin, Ibuprofen, and tramadol, but still had "a lot" of pain. (*Id.* at 387.) Her blood pressure was 132/80, her BMI was 45.7, and her recorded blood sugar levels had ranged from 180 to 240. (*Id.* at 385, 387.) She was assessed with type 2 diabetes mellitus without complications, tendinitis and/or tenosynovitis of the elbow region, essential hypertension, and hyperlipidemia. (*Id.* at 388.)

On August 3, 2017, Plaintiff returned to Internist for a follow-up and medication refill, and she complained of pain in her right wrist. (*Id.* at 378.) She reported using a new hand brace, but it was "not helping." (*Id.* at 380.) Her recorded blood sugar levels had ranged from 96 to 180, with most under 150; Internist noted that her levels "ha[d] gone down quite a bit." (*Id.*) She reported fatigue and excessive sleepiness, arthralgias/joint pain, right radial tenderness and pain, left arm with intermittent pain, and numbness in her left fourth finger. (*Id.*) She had normal cardiovascular, abdomen, and neurological functioning, and a BMI of 46.9. (*Id.* at 379, 381.) She was diagnosed with spasm of back muscles, carpal tunnel syndrome, type 2 diabetes mellitus uncontrolled, benign essential hypertension, hyperlipidemia, and fatigue. (*Id.* at 381-82.) On August 31, 2017, Plaintiff complained of a "mild" headache. (*Id.* at 375.) Her pain continued to "linger" despite taking metoclopramide to ease her symptoms. (*Id.*) She also reported continued arthralgias/joint pain, right radial tenderness and pain, intermittent pain in left arm, numbness in her fourth finger, fatigue, sleep disturbances, but no anxiety. (*Id.* at 377.) Her BMI was 46.5. (*Id.* at 377.) She had

normal cardiovascular, abdomen, and neurological functioning, but her range of motion and tenderness in her right wrist and left arm was limited, and she was positive for Tinel's and Phalen's[5] signs. (*Id.* at 378.) She was diagnosed with type 2 diabetes mellitus uncontrolled, migraine without aura, arthritis (unspecified osteoarthritis), and carpal tunnel syndrome (right upper limb). (*Id.*)

On June 21, 2018, Plaintiff returned to Internist for a follow-up and for pain in her left hand. (*Id.* at 368-71.) Her blood pressure was 125/82, and her reported blood sugar levels ranged from 70 to 150; she had a "few" hypoglycemic episodes, with shaking and fatigue, in the middle of the workday due to a 3:00 p.m. lunch break. (*Id.* at 368, 370.) She had tenderness and limited range of motion in her right wrist and left arm, and she was positive for Phalen's and Tinel's signs. (*Id.* at 370.) She denied chest pain, dizziness, fever, chills, nausea, or vomiting; she had normal cardiovascular, abdomen, and neurological functioning, and her BMI was 45.7. (*Id.* at 368, 370.) Her diagnoses from August 3, 2017 were continued; she was assessed with morbid obesity and given a 3-month follow-up for a BMI check. (*Id.* at 370-71.)

On August 12, 2018, Plaintiff presented to the ER at Baylor University Medical Center (Baylor) with back pain. (*Id.* at 474.) Her thoracic area had vertebral tenderness and decreased range of motion, and she had pain at rest and with movement. (*Id.* at 483.) She was administered Tylenol-Codeine #3 and diagnosed with arthritis, chronic back pain, fatigue, obesity, sprain, and muscle spasm. (*Id.* at 472, 484.) Imaging of her right thoracic spine (T-spine) revealed "[m]ild dextroconvexity with apex at the T8 vertebral body level", no spondylolisthesis or focal exaggerated kyphosis, and mild dextroscoliosis of the T-spine. (*Id.* at 473.)

---

[5] "Phalen's sign is defined as an 'appearance of numbness or paresthesias within 30 to 60 seconds during the Phalen test, a positive sign for carpal tunnel syndrome.'" *Ronda C*, 2018 WL 4658504, at *1 (quoting *Gomez*, 2015 WL 4068499, at *4 n.10) (quoting Dorland's Illustrated Medical Dictionary, 1714 (32d ed. 2012))).

On August 15, 2018, Plaintiff visited Internist for a "post [ER]" visit for chronic back pain. (*Id.* at 364.) She reported tenderness and decreased range of motion in her back, left arm, and right wrist. (*Id.* at 367.) She was diagnosed with T-spine pain, diabetic dyslipidemia associated with type 2 diabetes mellitus, benign essential hypertension, and migraine with aura. (*Id.* at 367-68.)

On September 27, 2018, Plaintiff visited Internist for a medication refill and follow-up for her back pain. (*Id.* at 335.) She reported muscle aches, pain with movement, swelling in the extremities, and stiffness, but no muscle weakness; she was taking baclofen and Ultracet, which "help[ed] with pain." (*Id.* at 337.) Her BMI was 46.6. (*Id.* at 335.) The same day, Plaintiff submitted to imaging of the T-spine, which revealed stable mild thoracic curvature convex right with apex at curvature at T8, no paraspinal abnormality, mild elevation of right hemidiaphragm, no compression deformity, and mild degenerative change at cervicothoracic junction. (*Id.* at 328.) There was "[s]table appearance of [T-spine] with mild dextro scoliosis." (*Id.*)

On October 25, 2018, Plaintiff received physical therapy from Brian Langdon, PT (Therapist). (*Id.* at 321.) She reported ongoing pain between her shoulder blades that started to increase on August 12, 2018. (*Id.*) Her pain ranged from 8/10 to 9/10. (*Id.*) She had -5/5 strength bilaterally, moderate flexibility in T-spine bilaterally, and gross range of motion within functional limit bilaterally; her Oswestry Test resulted in 44 percent bilaterally. (*Id.*) Therapist identified "[d]ressing" as a functional limitation, noting, "[Left Extremity] Lifting[,] Loss of Motion[,] Pain", and he identified "[r]eaching [o]verhead" as a postural limitation, noting "Work Tolerance". (*Id.*) He outlined the following short-term and long-term goals, respectively:

1. Increase range of motion in T-spine area
2. Increase strength of -5/5
3. Better shoulder blade motion
4. Decrease pain by 5/10
5. Better posture

1. Increase range of motion to T-Spine to [within functional limit]
2. Increase strength to 5/5
3. [Return to work] w[ith] good function
4. Patient will be pain free with working
5. Patient will be independent with home exercise program[.]

(*Id.* at 322.) He advised 2 to 3 physical therapy sessions per week for 4 weeks and opined that Plaintiff's prognosis was "GOOD with anticipated normal recovery time." (*Id.* at 321-22.) (capitalization in original).

On October 26, 2018, Plaintiff visited Internist. (*Id.* at 357-58.) She complained of continued upper back pain and reported that she had started going to physical therapy twice a week. (*Id.* at 360.) Her BMI was 46.6. (*Id.* at 358.) Internist noted that Plaintiff's diabetic dyslipidemia and benign essential hypertension were "stable". (*Id.* at 360.) She assessed Plaintiff with pain in the T-spine and advised her to continue physical therapy; she also assessed her with carpal tunnel syndrome but noted that Plaintiff "manage[d] with hand brace". (*Id.* at 360-61.) She advised her to return in 3 months for a BMI check. (*Id.* at 361.)

On November 28, 2018, Plaintiff returned to Internist for a follow-up and to discuss the Ultracet medication. (*Id.* at 354.) She reported continued upper back pain, attending physical therapy sessions twice a week, doing her home therapy exercises, and exercising, but not "much" due to the pain. (*Id.* at 356.) Plaintiff was taking baclofen and Ultracet[6], both of which "provide[d] some pain relief". (*Id.*) Her recorded blood sugar level had ranged from 80 to 130; she denied any hypo- or hyperglycemic episodes. (*Id.*) She had normal cardiovascular, abdominal, and neurological functioning, decreased range of motion and tenderness in her wrist, arm, and back, and her BMI was 45.9. (*Id.* at 354, 356-57.) Internist advised Plaintiff to return to work "with restrictions", including work not more than 4 hours a day and 20 hours a week, and to take 30-

---

[6] Plaintiff reported that Ultracet gave her nausea. (doc. 18-1 at 354.)

6

minute breaks every 2 to 3 hours to stretch her back, and never bend, stoop, or lift more than 10 pounds. (*Id.* at 357.) She diagnosed Plaintiff with mixed hyperlipidemia, pain in the T-spine, benign essential hypertension, diabetic dyslipidemia associated with type 2 diabetes mellitus, and lumbosacral radiculitis. (*Id.*)

Also on November 28, 2018, Internist completed a Physical Assessment, which was a one and half-page checkbox and fill-in-the-blank questionnaire. (*Id.* at 340-41.) She diagnosed Plaintiff with T-spine pain and opined that her symptoms were "often" severe enough to interfere with her attention and concentration, and that the medication side effects, like upset stomach and drowsiness, might impact her capacity for work. (*Id.* at 340.) Plaintiff would not need to lie down during the workday, but she would need a 30-minute break every two to three hours to stretch her back. (*Id.*) She could lift 10 pounds frequently and 20 pounds occasionally (but never 50 pounds), walk one city block without rest or significant pain, sit 4 hours of an 8-hour workday, and stand and/or walk 4 hours of an 8-hour workday. (*Id.*) Plaintiff could handle, finger, and reach 20 percent of the workday with her right upper extremity and 80 percent of the day with her left upper extremity. (*Id.*) She concluded that Plaintiff would miss 3 or 4 days per month due to impairments or treatments. (*Id.* at 341.) She checked a box to indicate that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (*Id.*) No explanatory notes or supporting objective tests and examinations accompanied the assessment.

In December 2018, Plaintiff completed a function report. (*Id.* at 212-19.) She reported that she was unable to walk or sit for a "long" period of time "without hurting" and to lift more than 20 pounds with her right hand. (*Id.* at 212.) She slept most of the day because of her medication. (*Id.* at 213.) She needed help taking showers and tying shoelaces, but she prepared her own meals,

shopped in stores, drove, and did not need to be accompanied when she went out. (*Id.* at 213-16.)

On January 22, 2019, state agency medical consultant (SAMC) Amita Hegde, M.D., completed a physical RFC assessment based on a review of Plaintiff's record. (*Id.* at 55-65.) She noted that Plaintiff alleged disability based on the impairments of diabetes, peripheral neuropathy, scoliosis, high blood pressure, high cholesterol, migraines, as well as back, foot, and hand/wrist/arm problems. (*Id.* at 56.) Plaintiff's ability to sustain work was "somewhat" limited by her symptoms, but they did not wholly compromise her ability to independently initiate, sustain, or complete activities, and her alleged limitations were not "wholly" consistent with the evidence in the file. (*Id.* at 58-59.) She considered Plaintiff's activities of daily living, medication treatment, third party statements about her symptoms or functioning, and longitudinal treatment records. (*Id.* at 60.) She opined that the impairments of "spine disorders", diabetes mellitus, and carpal tunnel syndrome were severe, and that essential hypertension was non-severe. (*Id.* at 59.) She assessed Plaintiff's physical residual functional capacity (RFC) as follows: lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit about 6 hours in an 8-hour workday, stand and/or walk about 6 hours in an 8-hour workday, unlimited push and/or pull (except as limited for lift and/or carry), occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs but never climb ladders/ropes/scaffolds, unlimited reaching in any direction, handling and feeling, but limited fingering bilaterally,[7] and "avoid even moderate exposure."[8] (*Id.* at 58, 60-62.) She noted that there was no indication of a medical opinion from any medical source. (*Id.* at 63.)

On February 16, 2019, Plaintiff completed a second function report. (*Id.* at 229-36.) She

---

[7] She specifically based her manipulative limitations on evidence showing that Plaintiff had limited range of motion and tenderness in her right wrist and left arm, had Phalen's and Tinel's signs, and her right hand had more limitations than her left. (doc. 18-1 at 61.)

[8] She noted "neuropathy" as explanation for the hazard limitation. (doc. 18-1 at 62.)

drove and went out unaccompanied. (*Id.* at 232.) She checked boxes to indicate that it was hard for her to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (*Id.* at 234.) Although she reported that she could walk half a block, and that she needed 10 to 20 minutes to rest before she could resume walking, she also reported using a cane that was prescribed to her in 2006 only as needed, noting "I'm not bad enough to use it." (*Id.* at 236.)

 On March 6, 2019, Plaintiff presented to Internist for a medication refill and a return-to-work letter. (*Id.* at 347.) She reported that her medication "provide[d] some pain relief", that she had done physical therapy, and that she was "ready to go back to work." (*Id.* at 349.) Her recorded blood sugar levels had ranged from 80 to 130, and she denied any hypo- or hyperglycemic episodes. (*Id.*) She further reported night sweats (but no fever or weight gain/loss), snoring (but no difficulty hearing or ear pain), muscle aches, arthralgias/joint pain, upper back pain (but no muscle weakness, swelling in the extremities, chest pain, dizziness, or headaches), migraines (but no loss of consciousness, numbness, or seizures), depression (but no sleep disturbances or anxiety), and normal cardiovascular, respiratory, and gastrointestinal symptoms. (*Id.*) Her thoracolumbar appearance had normal curvature, her BMI was 46.8, her blood pressure was 134/84, and she had normal gait but tenderness and decreased range of motion in her wrist, arm, and back. (*Id.* at 347, 350.) She was assessed with type 2 diabetes mellitus uncontrolled, pain in the T-spine, mixed hyperlipidemia, and benign essential hypertension. (*Id.*)

On April 4, 2019, SAMC Robin Rosenstock, M.D., performed an RFC assessment based on Plaintiff's medical records. (*Id.* at 68-80.) She generally affirmed SAMC Hedge's physical RFC assessment, except she noted that Plaintiff's postural limitations were due to her history of T-spine pain, mild dextroscoliosis, and morbid obesity, and that her right hand was limited to occasional use while her left hand was limited to frequent use. (*Id.*) Although Plaintiff's activities of daily

9

living had changed, they did not suggest a "significant" change in functional abilities, and she had made no new allegations or alleged any change or worsening of her condition. (*Id.* at 78.) She reported "occasional" cane use. (*Id.*) The SAMC concluded that Plaintiff's medical records were current, sufficient, and relevant to accurately assess the request for reconsideration, and that there were no objective findings to support or document persistent, worsening, or additional severe impairments to significantly erode or reverse the initial assessment. (*Id.*) She also concluded that Plaintiff's allegations were partially consistent with the overall evidence of record. (*Id.*)

On July 7, 2019, Plaintiff presented to Baylor ER, complaining of "sharp" left arm pain, which she reportedly had for almost 2 months. (*Id.* at 492, 503-04.) She appeared "uncomfortable" but was cooperative, pleasant, and in no apparent distress. (*Id.* at 504-06.) She moved all extremities, had steady gait, and denied chest pain or shortness of breath. (*Id.* at 505.) She underwent an electrocardiogram. (*Id.* at 507.) She was diagnosed with sprain of left shoulder girdle. (*Id.* at 503.) A sling was applied to her left shoulder, she was prescribed Ibuprofen, advised to follow up with her internist for further diagnostic work and continuance of care, and discharged the same day in stable condition. (*Id.* at 492, 503.)[9]

On September 27, 2019, Plaintiff presented to the Parkland ER, complaining of difficulty ambulating at home, dizziness, arm pain, and decreased range of motion in her left shoulder. (*Id.* at 527, 530.) She was positive for arthralgias and dizziness but had no respiratory or cardiovascular symptoms; her BMI was 43.6. (*Id.* at 529.) She was given Antivert and IC fluids, and she underwent a computed tomography (CT) scan of the brain, which revealed no acute intracranial abnormality. (*Id.* at 530-31, 534.) Hours later, Plaintiff ambulated with a steady gait unassisted

---

[9] At a visit to Parkland on February 13, 2020, Plaintiff reported that she had fallen and injured her left shoulder in "July 2019." (doc. 18-1 at 565.)

and stated that her symptoms had improved. (*Id.* at 530.) She was diagnosed with vertigo and discharged the same day. (*Id.* at 527, 532-33.)

On November 8, 2019, Plaintiff returned to Parkland to establish primary care and request a medication refill, and she complained of diabetes and hypertension. (*Id.* at 541, 544.) She reported noncompliance with glipizide and metformin for diabetes (she had missed taking it twice per week), insulin glargine pen also for diabetes (she had not picked it up due to cost), Crestor for hyperlipidemia (she had not taken it for 2 months), and lisinopril for hypertension (she had not taken it that day and her blood pressure was 142/89). (*Id.* at 544.) Her BMI was 47.9. (*Id.*) In a five-minute phone call with Parkland on November 18, 2019, Plaintiff reported that she had picked up the diabetes mellitus medication that day. (*Id.* at 557.) She was diagnosed with hyperlipidemia and advised to take her medications as prescribed, avoid eating carbohydrates, and exercise 5 times per week. (*Id.*)

On February 13, 2020, Plaintiff presented to Parkland "to establish care". (*Id.* at 565.) She reported taking Tramadol and Tylenol for lower back pain. (*Id.* at 565.) She also reported blurred vision, blood in stool, nocturia 5 times per night, and numbness in the fingers and toes, but no respiratory or cardiovascular symptoms; she had normal cardiovascular, pulmonary, musculoskeletal, and neurological functioning. (*Id.* at 565, 569.) She was morbidly obese, had a BMI of 47.5, and was advised to start brisk walking. (*Id.* at 565, 569-70.) Her insulin dosage was adjusted, and she was diagnosed with type 2 diabetes uncontrolled, essential hypertension, and hyperlipidemia. (*Id.* at 570.)

## C.  March 23, 2020 Hearing

On March 23, 2020, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 19-28.) Plaintiff was represented by an attorney. (*Id.*)

*1. Plaintiff's Testimony*

Plaintiff testified that she worked part-time (no more than 10 hours a week) as a "companion", taking clients to run errands and doctor visits, for $10.00 an hour at Monarch Senior Solutions in the first quarter of 2019; her pay increased to $12.00 an hour the next quarter. (*Id.* at 38-39.) Once that job "played out", she "didn't do anything else." (*Id.*)[10]

On cross-examination, Plaintiff testified that she had experienced back pain since 2017 but did not seek medical care until 2018; her pain medication helped "a little" but "[n]ot much" because it made her sleepy throughout the day and required her to nap or lie down 3 times a day for a total of 4 or 5 hours a day. (*Id.* at 40-41.) She could stand and/or walk for 4 hours a day and sit for 2 to 3 hours at a time before she needed to lie down. (*Id.* at 41.)

Plaintiff, who was right-handed, had carpal tunnel syndrome and arthritis in her right hand; she was prescribed medication and wore a right-hand brace. (*Id.* at 41-42, 49-50.) She had dropped a "couple of things" with her right hand; it would "give out," so she had to use both hands to lift "anything heavy", including a gallon of milk. (*Id.* at 41-42.) She could write or type for 2 to 3 hours, but she could use her right hand for "probably" only 1 hour due to swelling and pain. (*Id.* at 42.)

Still on cross-examination, Plaintiff testified that she also had issues with her left rotator cuff and required a pillow across her back while sitting, including while driving, which she could do for only an hour before she needed a break. (*Id.* at 43.)

In September 2019, Plaintiff had vertigo and was prescribed medication; at the time of the hearing, she still had "breakthrough" periods during which she had "little" spells, felt her balance was "off", and was "very" unstable. (*Id.*) It happened every day in the morning and early afternoon

---

[10] At the time, she had trouble lifting. (doc. 18-1 at 38.)

and required her to wait until everything stopped spinning before she got up and took her medication, which "kind of help[ed] a little bit". (*Id.* at 44.) She had fallen twice. (*Id.*)

Plaintiff's sugar level had been "almost 200", so she had been referred to a specialist, who had adjusted her insulin and "c[ould]n't seem to get it down." (*Id.*) She had started having numbness in her fingers and toes, but she denied pain. (*Id.*)

On examination, Plaintiff testified that an insurance change prevented her from continuing to see a physician. (*Id.* at 45.) She was taking medication for vertigo. (*Id.* at 45-46.) She denied being able to do the activities of daily living she had reported a month earlier in February 2019, including going out once a day, driving independently, shopping, handling money, watching television, reading, going for walks in the park, spending time with others, and going to church. (*Id.* at 46.) She explained she had not gone on a walk because she could not walk "that long", and she had not been to church unless someone accompanied her because she had pain with sitting and standing and she was unable to stay until 2:00 p.m. (*Id.* at 46-47.)

*2. VE's Testimony*

The VE testified that Plaintiff had relevant past work as a cashier (DOT 211.462-010, light, SVP-2)[11]. (*Id.* at 49.)[12]

The VE considered a first hypothetical individual, who had Plaintiff's age, education, and work experience, and could perform light exertional activity, and lift 20 pounds occasionally and 10 pounds frequently, stand and walk 6 hours of an 8-hour work day, sit 6 hours of an 8-hour workday, occasionally balance stoop, kneel, crouch, climb ramps and stair, but not climb ladders,

---

[11] DOT stands for Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

[12] Plaintiff's other past work job as an orderly was not considered because it was heavy exertional, which was more than the SAMCs' opinion. (doc. 18-1 at 49.)

ropes, or scaffolds, occasionally use her right hand but frequently use her left hand, and would avoid "even moderate" exposure to hazards. (*Id.* at 49-50.) The individual could not perform Plaintiff's past work of a cashier. (*Id.* at 49.) The individual could perform as a hostess (DOT 349.667-010, light, SVP-2), with 75,000 jobs nationally; bakery worker, conveyor line (DOT 524.687-022, light, SVP-2), with 15,000 jobs nationally; and quality control inspector, agricultural products (DOT 921.685-046, light, SVP-2), with 10,000 jobs nationally. (*Id.* at 50-51.)

The VE considered a second hypothetical individual who also had the age, education, and work experience as the first hypothetical, and could sit 4 hours of an 8-hour workday, sit and walk 4 hours of an 8-hour workday but would need 30-minute unscheduled breaks every 2 to 3 hours to strength her back before she could return to work, and frequently lift 10 pounds and occasionally 20 pounds. (*Id.* at 51.) The individual could not perform any work at a competitive level. (*Id.*) Because of the severe erosional effects of these limitations, there would be 30 to 35 jobs available under the light, unskilled occupational base, with less than 250,000 jobs nationally in total. (*Id.* at 52.)

On cross-examination, the VE testified that 2 absences for month for unskilled work would "probably be excessive", although there might be a little more latitude, e.g., 1 or 2 days per month, for some unskilled work before job retention became problematic. (*Id.*)

## D.  ALJ's Findings

The ALJ issued his decision on May 11, 2020. (*Id.* at 19-28.) At step one, he found that Plaintiff had met the insured status requirements through December 31, 2024, and she had not engaged in substantial gainful activity since the alleged onset date of August 30, 2018. (*Id.* at 21.) At step two, he found that Plaintiff had the severe impairments of carpal tunnel syndrome, lumbar radiculitis, obesity, and vertigo, as well as non-severe impairments of hypertension, type 2

diabetes, migraines, mild dextroscoliosis, left shoulder sprain, and hyperlipidemia. (*Id.* at 22-23.) He also found that she did not have the medical determinable impairments of neuropathy, knee or foot problems, or numbness in her fingers or toes. (*Id.* at 23.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.1520(d), 404.1525–404.1526, 416.920(d), 416.925–416.926). (*Id.*) He expressly considered Listings 1.02 (carpal tunnel syndrome) and 1.04 (lumbar radiculitis) in his findings. (*Id.* at 24.)

Next, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform less than the full range of light work, defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as the ability to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours of an 8-hour workday, and sit 6 hours of an 8-hour workday; could never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, occasionally balance, kneel, stoop, crouch, and crawl, occasionally use her right hand and frequently use her left hand, and must avoid even moderate exposure to hazards in the work environment. (*Id.*) At step four, he determined that Plaintiff was unable to perform her past work. (*Id.* at 26.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 27-28.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from August 30, 2018, through the date of his decision. (*Id.* at 28.)

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.   ISSUE FOR REVIEW

Plaintiff presents one issue for review: "The ALJ's RFC determination is not supported by substantial evidence because he failed to adequately assess [Internist]'s opinion in accordance with the prevailing rules and regulations." (doc. 27 at 4.)

### A.   Medical Source Opinion

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). A medical opinion is a statement from a medical source about what the claimant can still do despite her impairments and whether she has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. *Id.* §§ 404.1513(a)(2), 416.913(a)(2).

The guidelines provide that the ALJ will explain in his determination or decision how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted).

Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See id.* §§ 404.1520c(c)(1), (2), 416.920c(c)(1), (2). The ALJ must explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). He may, but is not required to, explain how he considered the remaining factors. *Id.*

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole responsibility for a disability determination rests with him. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

## B.  Internist's Physical Assessment

Plaintiff contends that the ALJ "failed to build a logical bridge" between the evidence and

his finding that Internist's opinion was "partially persuasive". (doc. 27 at 14.) The Commissioner responds that the ALJ "properly considered the medical opinions of record". (doc. 30 at 2.)

Internist physically examined Plaintiff at least nine times between February 2017 and March 2019. (doc. 18-1 at 347-405.) Plaintiff complained of arthralgias/joint pain, tenderness, or decreased range of motion in her back, arms, and wrists. (*Id.* at 335, 337, 349-50, 356, 360, 366-68, 370, 377-78, 380, 385, 387.) Her prescribed pain medications provided some relief. (*Id.* at 349, 375, 387.) She reported numbness in her fingers and toes at least twice. (*Id.* at 377, 380.) Her blood pressure was 132/80 in February 2017, 125/82 in June 2018, and 134/84 in March 2019. (*Id.* at 347, 368, 385.) The range of her recorded blood sugar levels dropped from "180 to 240" in February 2017, to "80 to 130" in November 2018 and March 2019. (*Id.* at 349, 370, 380, 387.) Her BMI generally ranged between 43.6 and 47.9. (*Id.* at 335, 347, 354, 358, 368, 375, 379, 382.) She had normal cardiovascular, abdomen, and neurological functioning. (*Id.* at 349, 356-57, 370, 378, 381.) Plaintiff's diagnoses regularly included spasm of back muscles, carpal tunnel syndrome, type 2 diabetes mellitus (uncontrolled or "without complication"), benign essential hypertension, hyperlipidemia, and morbid obesity. (*Id.* at 350, 357, 360-61, 367, 370-71, 378, 381-82, 388.) Her diagnoses occasionally included arthritis, diabetic dyslipidemia associated with type 2 diabetes mellitus, fatigue, migraine without aura, pain in the T-spine, and tendinitis and/or tenosynovitis of the elbow. (*Id.* at 360, 367-68, 378, 381, 388.) At her last visit with Internist in March 2019, Plaintiff stated that while she continued to have upper back pain, she was "ready to go back to work." (*Id.* at 349.)

The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are "brief and conclusory" and "lack 'explanatory notes' or 'supporting objective tests and examinations.'" *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th

Cir. 2017) (citing *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)). District courts in this circuit have found that under the new regulations, brief and conclusory opinions unsupported by relevant medical evidence lack supportability. *See*, *e.g.*, *Bruen v. Kijakazi*, No. 1:20-CV-278 LGI, 2022 WL 452411, at *3 (S.D. Miss. Feb. 14, 2022) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best .... [but when] these so-called reports 'are unaccompanied by thorough written reports, their reliability is suspect.'") (citation omitted); *Benson v. Saul*, No. 3:20-CV-1974-E-BH, 2022 WL 868706, at *16 (N.D. Tex. Mar. 8, 2022), *report and recommendation adopted*, No. 3:20-CV-1974-E-BH, 2022 WL 865886 (N.D. Tex. Mar. 23, 2022) (finding that the lack of persuasiveness of the check-box form goes to its lack of supportability); *Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860 *8 (N.D. Tex. Dec. 4, 2020) (illustrating how less persuasive a "brief and conclusory" check-box questionnaire stands in comparison to a narrative statement, which contains substantive explanation) (citing *Heck*, 674 F. App'x at 415, and *Foster*, 410 F. App'x at 833)).

The ALJ considered Internist's November 2018 Physical Assessment, which was a one and a half-page checkbox and fill-in-the-blank questionnaire, and her opinion that:

> [Plaintiff]'s symptoms were often severe enough to interfere with her attention and concentration. [She] did not need to lie down during the day. [She] could lift 20 pounds occasionally, lift 10 pounds frequently, walk a block, sit 4 hours of an 8-hour day, and stand and/or walk 4 hours of an 8-hour day. [She] assessed that [Plaintiff] could handle, finger, and reach 20% of the workday with her right upper extremity and 80% of the day with her left upper extremity. [She] further opined that [Plaintiff] needed to stretch her back every 2 [to] 3 hours for 30 minutes. Finally, [she] determined that [Plaintiff] would miss 3 [to] 4 days per month due to exacerbation of her symptoms.

(*Id.* at 26 (citing *id.* at 340-41.)) The ALJ expressly found Internist's opinion partially persuasive, because "it is consistent with other opinions in the record, but the medical evidence as a whole, including evidence received at the hearing level, supports less limitations, as reflected in the residual functional capacity set out above." (*Id.*)

Here, although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1520c(c)(1)-(5), he specifically stated that he considered the opinion evidence and prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 416.1520c and § 416.920c, and his decision reflects consideration of supportability and consistency, the two most important factors in evaluating the persuasiveness of medical opinions. (doc. 18-1 at 24.) Earlier in his decision, he specifically considered that Plaintiff had complained of back spasms and back pain, and Internist had diagnosed her with back spasms and lumbosacral radiculitis. (*Id.* at 22 (citing *id.* at 354-57, 380-81.)) The ALJ also considered that Plaintiff had complained of pain in her wrists (with more pain in her right than her left wrist), and that Internist had diagnosed her with carpal tunnel syndrome. (*Id.* at (citing *id.* at 375, 378.)) Although Plaintiff mentioned in her March 2019 testimony that she used a hand brace, Internist found in October 2018 that Plaintiff "manage[d]" with a brace despite her diagnosis of carpal tunnel syndrome, and Plaintiff did not mention using a hand brace in either her December 2018 or February 2019 function reports. (*See id.* at 42, 218, 235, 358, 361.) The ALJ concluded that through March 2019, when Internist last examined Plaintiff, her physical examinations were "generally the same" because she had tenderness and decreased range of motion in her wrist, arm, and back, but there was no mention of decreased strength or dexterity. (*Id.* at 25 (citing *id.* at 347-405.))

The ALJ also considered that Plaintiff "suffer[ed]" from obesity, her BMI ranged between 43 and 47, her blood pressure levels were "generally normal"; after receiving treatment for headaches in August 2017, there was no evidence that she had "continuing problems" with them. (*Id.* at 22-23 (citing *id.* at 347-405.)) The ALJ also considered that although Plaintiff's "providers", including Internist, had "generally described" her diabetes as "uncontrolled", she had not complained of any diabetes-related symptoms, and she had not always been medication compliant.

(*Id.* (citing *id.* at 347-405, 544-49.)) Although Plaintiff's August 2018 imaging revealed mild dextroscoliosis of the T-spine, the ALJ specifically found no evidence of any treatment for it, such as a brace or injections. (*Id.* at 23 (citing *id.* at 473.)) Finally, the ALJ considered the SAMCs' opinions, which found that Plaintiff could perform work at the light exertional level with additional limitations in her ability to climb, manipulate, and "perform[] postural activities". (*Id.* at 26 (citing *id.* at 55-65, 68-80.))

Because the regulations require only that the ALJ "explain how []he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in h[is] determination or decision," the ALJ properly evaluated Internist's physical assessment. 20 C.F.R. § 404.1520c(b)(2); *see Williams v. Kijakazi*, No. 3:20-CV-3222-M-BH, 2022 WL 3045752, at \*9 (N.D. Tex. July 6, 2022) (finding that the ALJ properly evaluated the opinions of the plaintiff's treating physician where he specifically found that physician's opinion was not supported by his treatment records or the objective medical evidence and was inconsistent with the plaintiff's medical records), *report and recommendation adopted*, No. 3:20-CV-3222-M-BH, 2022 WL 3042961 (N.D. Tex. Aug. 2, 2022); *see also Fletcher v. Comm'r, SSA*, No. 4:21-CV-00173SDJCAN, 2022 WL 3130860, at \*9 n.8 (E.D. Tex. June 21, 2022) ("The ALJ determined the objective medical evidence does not support the severity of limitations in Dr. Wishnew's opinion evidence, and treating physicians are not afforded controlling weight under the new rule."), *report and recommendation adopted*, No. 4:21-CV-173-SDJ, 2022 WL 3107905 (E.D. Tex. Aug. 4, 2022). Additionally, because it is a brief and conclusory opinion lacking explanatory notes accompanying diagnostic or specific clinical examinations, the ALJ could properly discount portions of Internist's physical assessment for lacking "any substantive explanation." *See Benson*, 2022 WL 868706, at \*16; *Stephens*, 2020 WL 7122860 \*8 (citing *Heck*,

674 F. App'x at 415, and *Foster*, 410 F. App'x at 833)).

In conclusion, because the ALJ's decision considered the supportability and consistency of Internist's physical assessment and gave "careful consideration of the entire record", including the medical and non-medical evidence and prior administrative medical findings, in accordance with the requirements of 20 C.F.R. § 404.1520c and § 416.920c, his RFC determination is supported by substantial evidence. *See Hill v. Saul*, No. 3:20-CV-1914-BH, 2022 WL 975608, at *14 (N.D. Tex. Mar. 30, 2022) (finding that the ALJ properly addressed the supportability and consistency factors and that, because his RFC determination was based on medical evidence in record, it was supported by substantial evidence). The ALJ "built a discernible logical bridge" between the persuasiveness of Internist's physical assessment and that assessment's supportability and consistency with the record as a whole. *See Wendy M. B. v. Kijakazi*, No. 3:20-CV-02957-BT, 2022 WL 2704038, at *5 (N.D. Tex. July 11, 2022). Remand is not warranted on this issue.

## IV.   CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 27th day of September, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE